Good morning. Before you, you have the 1st District, 2nd Division Appellate Court, and to hear this case you have Justice Terry Lavin, Justice Mary Ellen Coghlan, and myself, Justice James Fitzgerald Smith. The following order and procedure are what we're going to deal with. First, the appellant will present the case, their case, in total for 10-15 minutes. No interruptions, so you get to do the whole thing on your own. Then the justices will ask you questions. After that, the appellee will get to present their case, and then the appellate will respond, and then we're ready to go. If in the course of this you feel like you're losing, because of the system, which I hate, but we got to deal with it, if you for some reason lose your train of thought, just pause or raise your hand and tell us to give you a second. And with that, I'll let you, Deborah, or the appellant, I assume you're the appellant. You may proceed. Thank you, your honor. Good morning, and may it please the court. I'm Deborah Lovey from the Exoneration Project, on behalf of the appellant Andre Brown. The only evidence in this case supporting the murder conviction was the show-up identifications made at the scene. This case is remarkable for all of the evidence that it lacked. There was never any lineup or photo array. Mr. Brown has always denied being the culprit and testified in his defense. The only physical evidence in the case, the gunshot residue testing, showed no residue on Mr. Brown's clothing. There was no gun recovered, despite a thorough search. Another man, matching the description of the shooter, was stopped by the police while biking in the vicinity of the shooting, but was released without any identification effort. Mr. Brown's location when he was arrested made no sense. The perpetrator had just fled east, and Mr. Brown was on the street of the shooting, the street where he lived, heading south. So biking in the wrong direction had he been the perpetrator. And despite the fact that Mr. Brown was wearing very distinctive clothing, with an Oakland Raiders emblem on the breast of his jacket, and on the back of his jacket, a brightly striped shirt, and a floppy Nike hat, no witness described the as so clothed. Against that backdrop of gaping omissions, this case featured about the worst show up identifications imaginable. There was a large crowd with a dozen police officers, a bunch of civilians, paramedics in the background trying to save the dying victim, and a chaotic scene. The police officers pulled their squad car up into the middle of an intersection with a bicycle hanging out of the back of the trunk. Mr. Brown was in the backseat of the car with an officer right at his side. Another officer shined a flashlight through the window of the car into his face, and then a string of witnesses made the identification in front of that large crowd and in front of each other. All of them trying to identify a total stranger of a different race who they had seen only under very challenging circumstances, and all of them having given only the most basic description of the perpetrator, black man, dark clothing, bicycle. That was it. In this context, the post conviction evidence, particularly the expert testimony regarding eyewitness identifications, and the recantation of the chief eyewitness, the target of the shooting, meets actual innocence standards and requires a new trial. The crux of this post conviction evidence was Dr. Cutler's expert testimony, and that was never considered by the lower court as part of the actual innocence equation. Because of that lapse, this court should conduct a de novo review of the evidence. And when the evidence is applied to the actual innocence factors, it is clear that a new trial is required. The primary question for this court to address, obviously, is whether the new evidence is sufficiently conclusive. Whether combined with the other post conviction evidence, the new evidence places the trial evidence in a different light, and undermines the court's confidence in the judgment of guilt. The new evidence in this case certainly does that. First, there was Dr. Cutler's testimony. He explained a number of features that undermine identifications all of which are applicable here. He talked about how identifications are less accurate when they're of a stranger, particularly when they're cross racial effort and identification and all of the efforts here at the identification were cross racial of either white or Latino witnesses trying to identify a black man. He talked about how hair and hairline, this area between the eyes and the top of the head are especially important. And that when a perpetrator wears a hat, an identification is particularly challenging and less reliable in the eyewitness world that's actually considered a disguise to be wearing a hat like that. He talked about high stress situations and weapons focus recall three out of five of these witnesses were in the line of fire being shot at when they supposedly encoded the identifying information. And he also talked about how suggestive circumstances taint identifications. And the circumstances here were incredibly suggestive. And what Dr. Cutler's testimony teaches us is that when a witness makes an inference that that is the person to whom they're supposed to whom they're supposed to identify, they then incorporate that into their memory of the event, and they're unable to differentiate between the two anymore. In addition to Dr. Cutler's testimony, there's also the recantation from Juan Campos. Recall, he was the target of the shooting, and he was the only witness with a close up view of the shooter. And he admits that he never saw the shooter's face. He's now an adult. He was a teenager at the time of trial. He's not in a gang any longer. He is working he has a father and a professional man. He does not know Andre Brown and testified he's never spoken to Andre Brown. He came under subpoena not really anxious to be part of this case, but told the court that he did not actually see the shooter's face. And when you couple that with Dr. Cutler's teaching about how the focus would have been on the weapon firing on him, instead of on the face of the shooter, that testimony resonates. This evidence meets the standards under People v. Robinson and People v. Coleman. It undermines confidence in the verdict, because the new evidence leaves no reliable identification witnesses left. Without Campos, the state would be left with only four witnesses, and no physical evidence, no witnesses, they'd be left with would be Timothy Copper, who was unable to make the identification at all until he saw the teenager come and make the identification and then was asked to reattempt it. And what Dr. Cutler has taught us is just how suggestive, excuse me, that would be. The second would be Carla Navarrete, who is the child who didn't even see the shooting. She just saw a biker across the street. And the man she saw was wearing a Nike hat that Mr. Brown was wearing. They'd be left with Don O'Reilly, who had only a glimpse of the shooter from 50 yards 50 feet away in the near dark when the shooter had turned for a second just to shoot at him. And again, Dr. Cutler's testimony about weapons focus surely resonates with O'Reilly. And Fuentes Roman, who is the victim's brother, who actually explicitly testified that under the circumstances, he just assumed they had caught the culprit. He was dealing with his brother bleeding in his arms for 10 to 15 minutes. As in people be whirl and people be galvan, the post conviction evidence in this case, initiating the only trial evidence is enough to support an actual innocence claim. But you have even more here because you also have the gunshot residue testing, which shows that there was no residue on Mr. Brown's cuffs and hat. You have the other defense witnesses supporting Mr. Brown's testimony in his defense, including Claudio Martinez, who was also targeted and said that this new that the shooter was misidentified. There is more than enough evidence here to undermine the court's confidence in the judgment of guilt, and the actual innocence claim should be granted. Additionally, however, should this court have any doubt about whether or not the actual innocence standards are met? Andre Brown's right to due process was violated. When he was barred from presenting his eyewitness expert at trial. This case is absolutely on all fours with people via Lerma, it was 100% reliant on the eyewitness testimony, the same factors from Lerma that impede an identification were present. In this case, the cross racial effort, the hat, the weapon, the waning light to show up the suggestible circumstances. This case had the additional factor that in Lerma, there was some evidence that the witness actually knew who they're identifying. So this case presents an even stronger case than people via Lerma. And in that context, it violated due process not to allow the expert to testify at trial. So under either theory, violation of due process or actual innocence, a new trial is required. Mr. Brown has been trying to challenge the faulty Any questions? I'm sorry. No, no. I'm asking the justices to ask their questions. I would ask you this that would you agree that Lerma did not establish a bright line rule requiring admission of expert testimony, but rather left it to the discretion of the trial court. I would agree that Lerma does not establish a bright line rule. There may be circumstances where a court might find it appropriate to not admit an expert. And there have been cases that have distinguished Lerma. But this case is absolutely the same set of circumstances as Lerma. And this is a case where Lerma applied, and the experts should have been allowed to testify. So you think the court abused its discretion and failing to allow the testimony that was offered at trial? Well, that was, I mean, that's a different question. That was I know, I'm asking a different question. Yes. So well, when the court considered a trial that was pre Lerma, that was at that time, as Lerma acknowledges, explicitly, the courts were a little bit concerned about this type of testimony. In the 20 plus years since then, however, the science has materially advanced, and it is now widely accepted, and sort of across the country, universally, the kind of testimony that courts view to be important, relevant, and accepted. And so in that context, I think, for instance, at a new trial, a court absolutely would allow this sort of expert testimony, whether or not the court, the original court on direct appeal erred, it didn't have the benefit of Lerma. And so the other thing I would ask you is this, I was on the Worrell case, I was a member of the panel. And tell me how this is so similar to Worrell, so as to command us to find actual innocence here. Absolutely. In Worrell, at the end of the post conviction case, the only affirmative evidence against the defendant had been undermined, and there was nothing left. And similarly, yeah, but what was what was that evidence? In that case, it was a confession, I believe it was it was a statement that was suppressed, if I recall correctly, unless I'm confusing them. I think I think it was a he was in a cab where the later in the day, the cab driver was killed, and his fingerprint was found on the cab. I'm sorry, I must have been I think, you know, I haven't looked at Worrell, you know, specifically, but this, this just doesn't resonate with me as being similar to Worrell is what I point I'm trying to make. My comparisons to both Worrell and Galvin were because those were two cases in which the court said, looked at the end of the post conviction case and said, there's nothing left. There's nothing if we had a retrial here. There's very little on one side of the equation, the way in which the court supposed to look at the actual innocence question is look at all of the new evidence. So look at compost his testimony, Dr. Cutler's testimony Martinez's affidavit and weigh that against what the evidence would be at a new trial. And when you when you look at what the evidence of guilt would be at the end of the day. It's pretty minimal. If this trial are happening now under what we now know about eyewitness identifications, there never, there never would have been a conviction and and so it falls into that sort of awkward spot of How do we pigeonhole it, but I think You say there, you say there wouldn't be a conviction, because you say that if the Expert on eyewitness testimony testified the jury would accept that and case would be found not guilty. That's a bit of a stretch. The only the so you you have one campus admitting that he didn't see the that he didn't see the shooter. So he's out of the equation. On retrial, you have four witnesses, then None of whom noticed very distinctive clothing that Mr. Brown was wearing an Oakland Raiders jacket with a with a large emblem on the chest and on the back a very stripy shirt. Ubiquitous Nike swoosh all they said was was black man dark clothing. That's all they had. And then you have this tremendously suggestive show ups with no lineup or no other type of identification. I think any jury would be highly skeptical and our burden here is just to prove that this cast, you know, legitimate doubt. On undermines the court's confidence in the judgment of guilt and I don't see how it could possibly not undermine the court's confidence when you have Just these highly, highly suggestive show ups and you apply modern science and what we now know about suggestion and about weapons focus and about the limits of eyewitness identification about how it's the leading cause of wrongful convictions about the reasons why that is the case. Why that wouldn't cause the court to undermine the confidence in the judgment of guilt. And that's all I have to prove I In order for Mr. Brown to be entitled to a new trial. He doesn't have to prove victory, although I am confident he could prevail in a new trial. He has to prove that he's undermined this court's confidence in the judgment of guilt and he certainly has met that work. You rely on Lerma But Teague versus Lane seems to contradict anything you've put forth on the Lerma argument. Well, first of all, very importantly, The, the retroactive there's no retroactivity issue with regards to the actual innocence component. Because people be Coleman tells us that you look at the universe of evidence that would be available on a new trial. So regardless, you don't have to even think about whether or not Lerma is applicable retroactive retroactively because we know that in a new trial. A testimony like Dr. Cutler's would be admissible. It's routinely admissible Lerma the Lerma court makes it clear that That it's an abuse of discretion, not to admit it when the case is 100% reliant on eyewitness testimony in these factors. I mean, our present the exact same factors. So we know That for actual innocence purposes. Dr. Cutler's testimony would be available on retrial. So it is part of the universe of evidence that needs to be considered when answering the actual innocence question. The only place where you reach the question of retroactivity is on the due process violation question. And for that. It's clear that this was not a new rule for key purposes, the state has not shown any authority for that proposition. They cite no cases suggesting that it is And when you look at cases that are similar where expert testimony is allowed regarding was sort of newly endorsed regarding bite marks or arson or fingerprints or DNA. It was not the term of our new rule under fatigue purposes and Lerma shouldn't be considered as such, either. If you had a new trial. How would you use the green testimony. I believe the green testimony would be admitted. I think it was just a witness sequestration problem there, but I would presume that the defense would like to present Brenda green, along with all the other defense witnesses to show that Mr. Brown was biking from his house, which He was biking south on the street of the shooting. Right next to his house, you know, if he had flooded. If he was the assailant, he would have kept going away from the crime. Or would have stashed his bike in his apartment or something. He wouldn't be casually biking away from his home in the wrong direction. So Brenda green helps make sense of why this conviction really is troubling and doesn't mesh with the evidence. You know, when you're talking about campus. Wouldn't you agree that it's well settled that recantation testimony is generally regarded as unreliable. I mean, campus campus will come into trial and say, I don't remember that day at all. I didn't see it compare and then he'd be impeached by what was said at the earlier trial and it's well settled law. I think, and you can tell me if I'm wrong. I'm happy to hear it. That that is generally unreliable. I think courts are frequently skeptical of recantations, but that doesn't mean that they must be rejected. And in this case where you have a witness with no connection to Mr. Brown A professional life and a father life and has left the gang now an adult no reason to lie and who isn't saying isn't even taking that extra step and saying, I know it wasn't him. He is merely saying, I never saw the shooters face. I only saw the gun turned and ran and then you have the added support of the expert testimony because you have Dr. Cutler saying that's exactly what happens in these kind of cases when somebody sees a gun their focus their eyes are drawn to the gun, not the face. And then they turn and run. So I think, well, you know, there are certainly circumstances where recantations are entitled to skepticism. This is not one of those circumstances. Juan Campos certainly should cause this court to have some undermine the court's confidence and have some doubt as to guilt here. How do you respond to the Evidence relied upon by the trial court of all these deals and correspondence and letters going back and forth in the preparation of these affidavits. Well, those went to the the Claudio Martinez affidavit and I guess I have two or two main responses. The first is that None of those letters impugn Andre Brown in any ways. It mostly suggests that Claudio Martinez was an overzealous witness. Or perhaps was trying to milk this situation for himself. It's unclear as to what was going on in that situation, but there's no sign. From any of them. Nothing. No way to infer that Andre Brown participated or solicited in anything ill nor with do they in any way undermine Campos's testimony. There's no meshing between them. But more importantly, the court ruled that if the state wanted to rely on that evidence they need to present invent an investigator to authenticate them. And the state declined. There's, there's a pile of letters that are sort of unclear and the court below said the light. Did not rely on letters and so they're not part of the consideration and I would urge this court to rule the same And but even if the court were to consider them. They don't impugn any of the witnesses that I'm relying on heavily Mr. Martinez's affidavit is also helpful, but it is not the primary focus. And so even if the court were to find that they did the letters detract from Martinez's statement. They do not in any way. detract from the importance of what Dr. Cutler had to say and upon Campos's admission Thank you. Anything else Nothing for me. All right, David, you can proceed. Thank you, Your Honors. May please the court. Good morning, Ms. Lohde. David Eskowich with the Cook County State's Attorney's Office on behalf of the people. I think it's important in a case like this that so far advanced in the process on post conviction review to just quickly outside outline some first principles. There was a third stage evidentiary hearing here. And so the trial court did make credibility determinations and other assessments on the believability of the petitioners proffered evidence of actual innocence. And so those disterminations do carry great weight on appeal because they were made at the third stage and in person by the trial court. Secondly, the petitioner raises an actual innocence argument and the standards for governing these types of claims. Are quite rigorous actually Our Supreme Court has explained that to present a viable actual innocence claim a petitioner must present, among other things, trustworthy eyewitness accounts and exculpatory physical evidence. So with those tough standards in mind, we can turn to the defendants evidence. The petitioners evidence and first take a look at how the trial court disposed of it. Right off the bat, the trial court found that Ms. Green petitioner and Mr. Elsie were not credible witnesses. The trial court declined to sign any weight to Mr campus finding his testimony to be confusing and lacking in any substantive recollection that would advance the petitioners case. The court found that Miss Wong Failed to Did not turn up a negative for gunshot residue. It wasn't exculpatory in that respect. All she could conclude was that it was possible. Given the component parts on the materials, the jacket and the hat that these materials were not in the presence of a gunshot or a firearm when it was fired. Or that if it were, it was removed in the intervening 14 to 16 years after it was first deposited there recall she didn't examine this until 2014 and the crime occurred in 1996 so she was working with material that very well could have been spoiled. Now we get to Dr. Cutler Dr. Cutler testified about the factors that theoretically can affect the reliability of eyewitness identifications. To prove to prevail on the actual innocence question. However, the defend petitioner must present exculpatory physical evidence nowhere in his testimony. Did Dr. Cutler opine that any of these five eyewitnesses suffered from any of the infirmities that could have affected the reliability of their identifications He declined to find that any of them were in fact unreliable or inaccurate. He acknowledged that a person who is beset by these various factors can nevertheless make a perfectly reliable and accurate identification With respect to the cross racial nature of the identifications. He had no idea whether that factor affected any of these eyewitnesses with respect to their accuracy. With respect to the weapons focus. He had no idea whether or not weapons focus was a factor that detracted from the reliability of any of these eyewitnesses. He never spoke to these eyewitnesses. He had no idea what these factors. Were doing in the minds of these eyewitnesses as they witnessed petitioner shoot Mr. Fuentes He could not say how much time elapsed during which these witnesses viewed the petitioner And to what extent that lapse of time would have had on their accuracy. And he could not say whether the petitioners wearing of a hat. Which disguise is a bit of a strong term, I believe, for a hat, but it was covering his head. Regardless, he could not say whether any or one of these eyewitnesses was affected by the petitioners wearing of a hat, with respect to their accuracy or their identifications This isn't exculpatory. This is opinion testimony regarding laboratory experiments under controlled environments that he Was, was, you know, entitled to discuss at the evidentiary hearing, but that had absolutely no bearing. Or any exculpatory value with respect to the petitioners innocence of this crime. Juan Campos is one of the five eyewitnesses that the petitioner has placed heavy reliance on in his innocence argument. Juan Campos testified at trial that, yes, this was the guy petitioner he shot at me. He shot Fuentes He pulled up on a bicycle flashed a gang sign and then pulled out a weapon and began firing. That was the man. In 2009 he submitted an affidavit for post conviction review. Apparently the petitioner didn't file his pro se petition until 2012 by the way. Even though he had managed to gather affidavits in the previous in the previous decade. Campos said in the affidavit that this was not the man who approached me the petition was not the man who approached me and shot. And it wasn't the man I saw he approached it wasn't the petitioner. At the evidentiary hearing, he gave a completely different, different version of events. He said that he didn't see the petitioners face. Which contradicts not only his trial testimony, but also his submitted affidavit. The petitioner doesn't really think that this is much of a big deal and that these two accounts are reconcilable, but they really aren't for innocence purposes, at least. To prove innocence. The, the petitioner has to present trustworthy eyewitness accounts and exculpatory physical evidence and this is neither Campos couldn't remember his own affidavit in which he had given an entirely different version of events. So the trial court correctly declined to assign Much if any weight to Juan Campos who's the entire substance of his testimony was that he couldn't remember anything he couldn't remember his affidavit and the only two things he could remember Were a he couldn't see the shooters face and be he ran as fast as he could away from the scene as soon as the shooting started. Claudia Martinez passed away a week before the evidentiary hearing in this case and the trial court. Properly declined to assign any weight to his account, considering a number of letters that the Petitioner and Martinez had exchanged over the years and preparing affidavits these letters suggested that there was collusion. Between Mr. Martinez and the petitioner about what exactly to put in these affidavits, including the affidavits Juan Campos and I agree with my my able opponent that These discussions don't bear on the petitioner or on campus necessarily but they sure bear on Mr. Martinez as a credible post conviction witness, especially when actual innocence is the issue. What just a couple of more points on on the actual innocence. Question, Your Honors. First, my opponent mentioned that the police initially had stopped another man before they stopped the petitioner And that is true, but the man that they stopped was on a motorized like a motorbike or a motorcycle of some sort. And the reports that came in concerning this petitioner Were that he was on a mountain bike manual bicycle. So the fact that the police stopped at the first person they found And declined to arrest him because it was a motorcycle actually Reflects Positively on the police efforts in this case. With respect to the show up identification. I agree that the on actual innocence all evidence can come in old and new. But I just would like to point the court to this court's decision on direct appeal that rejected on the merits the petitioners argument that the Show up procedure in this case was tainted in any way it was entirely properly handled. There was no collusion amongst the witnesses or the police beforehand. The show up was conducted within minutes literally of the crime. And the police took care as their testimony at trial reveals that the witnesses were kept separate and were shown the wit shown the person in the vehicle. In a way that was as least suggestive as possible. And this court has already found that and made that conclusion. The last part of this is the witnesses who did testify trial who The petitioner really hasn't made too much of a dent in here. Dr. Cutler's testimony, notwithstanding, there were even even excluding campus. We have for eyewitnesses who testify that this was the man. eyewitness Hopper was very, very specific in his testimony. He said he he observed and these are his words from his testimony. He observed and focused on petitioner Because he was very confused about what petitioner is doing. He appeared to be writing kind of aimlessly around in a loop up and down the street. Which was very weird and he noticed this. And so we kept an eye on him. He actually followed him out of the house because he had family outside and was worried about what was going to happen. He focused on his face and the fact that he didn't mention a Raiders logo is really not Too germane, it's very possible. He didn't know what a Raiders logo was and he did describe the jacket is having some white piping or stripes and the petitioner was wearing a white and black striped shirt under his black jacket when arrested. Carla never read witnessed the petitioner writing again as with Hopper suspiciously up and down the street. She also testified that he had his right hand in his waistband in a suspicious manner. And this raised her concerns she focused on his face. Don O'Reilly saw him from about 50 yards away and identified him. And Leo de Guerrero, the victim testified that he saw the petitioner right up on a bicycle before he drew weapon and then draw the weapon and begin firing. And again, I emphasize that none of Dr. Cutler's testimony. Addressed the veracity of these eyewitnesses. It only addressed theoretically what could affect some eyewitnesses in a laboratory controlled setting with respect to their veracity. With respect to the Lerma claim. This claim to is race judicata this court on direct appeal affirm the trial courts decision to exclude the evidence on the basis that the trial court did a thorough job of vetting Dr. Schooler, who was the doctor at the trial during the offer proof. And to the extent that the petitioner argues that this is like new that Lerma created a new paradigm for the admissibility of evidence. I would disagree with that. It simply refined the rules of evidence and said you can't automatically exclude expert testimony on eyewitness IDs, but to the extent it is new. I do believe we have a retroactivity problem. This is a new rule of procedure that the petitioner is trying to take advantage of on post conviction or collateral review and It is not the kind of watershed rule that would Go down in the annals of Illinois law is something so groundbreaking that it has to be replied applied retroactive retroactively, excuse me. Those two procedural concerns aside, just very briefly on the merits of the Lerma claim Lerma is is distinguishable on the facts. What drove the Lerma courts concern was the number of eyewitnesses, which were only two, one of whom was dead and actually was whose account was admitted only as an excited utterance. And significantly in Lerma the the defense was really limited in its cross examination of the eyewitness the surviving eyewitness On the ability of that eyewitness to see and remember and recall and under those unique circumstances, the court said you can't automatically exclude this kind of evidence when these important considerations are at play here in contrast, we have four eyewitnesses Who testified without impediments in decent light. There was no excited utterance hearsay exception admissibility problem where there was no cross examination potential And in terms of cross examination. I encourage the court to review the record. Again, the trial attorney in this case did a really, a really nice job of challenging each of these witnesses ability to see and recall and remember and provide accurate identifications That is my argument for the first part of the Of the day here, your honors. If you have any questions, I'm happy to answer them. Questions. None for me. None for me either. And for me. So, Deborah, I get you have the opportunity to do your conclusion. Absolutely. Your Honor, this. First of all, the state vastly overstates the burden for an actual innocence claim and I urge this court to take a look at the recent decision and people be Robinson. The standard is whether or not new evidence undermines confidence in the verdict and Dr. Cutler's testimony where I'd like to begin absolutely does so. The state is trying to in trying to differentiate the evidence and say that Dr. Cutler had to somehow speak to these witnesses and undermine these witnesses. Individually is the incorrect way of looking at this the testimony that Dr. Cutler gave is almost identical in the in the nature of it as the testimony that the Supreme Court relied on in Lerma It is appropriate for a scientist to testify about what the science is and to leave the jury to make the inferences to how it impedes or affects a witnesses testimony. And so, Dr. Cutler would it would is not expected, nor did the Lerma court expects these sort of social scientists to interview the witnesses and to testify as to their specific impairments. That is the domain of the jury. Instead, he gives appropriate he gave appropriate testimony about the types of impairments that would affect show up identification, such as these And how and then the jury can be left to apply them to the individual witnesses and to look at how The challenges of cross racial identification, the challenges of having a hat on the challenges of waning light the challenges of suggestibility those types of things impact the witness. So the testimony is absolutely appropriate and it meets the standard, which, like I said, the state has vastly overstated with regards to one compost. I would like to say that the trial court did not make any negative credibility findings as to him the trial court did not Accept the testimony of the other lay witnesses and it specifically did not make a negative credibility finding as to compost. And compost was very clear that he did not see the face of the shooter. Now, as to the rhetorical differences between how it was phrased in the affidavit when he was a young man and how he phrased it in testimony that is a First of all, you know, the two mesh, both of the testimony that he gave made it clear that he did not see Mr. Brown is the shooter. And the semantic difference of how it was phrased does not undermine his credibility. The court did not find it that way. And nor should this court, it's clear that he did not see the shooter. And when you couple that with Dr. Cutler's testimony explaining precisely why he would not have seen the shooters face that testimony makes sense. Just a couple more points, if I may. The first is that there's no support for the record support for the statement by the state that the motorcyclist was stopped. That is not my recollection of the record. There was another biker who was stopped. I'm dressed in black and happened to be a black man. That's all they had Mr. Brown, unfortunately, happened to be the first black man in dark clothing that they could find in the neighborhood. And that was what this identification was then based on it was a car hanging. It was a bicycle hanging out of the back of a car under very suggestive circumstances and he was not the only biker in the neighborhood. I just briefly would like to also address a couple more points here. That the direct appeal decision regarding the show up did not in any way consider the modern science and that is, it does not, as I explained in my first piece when discussing with Judge Levin, it does not dictate or control here. This court now has the benefit of all of the modern science on identification and all of the understanding we have about why eyewitness identifications are so frequently incorrect. And that new evidence is certainly enough to cast doubt and to meet the actual innocence standards. If I could really briefly also touch on the due process claim, I would like to just say that it is not barred by race judicata because the Lerma court refined the law. And when that type of change in the law happens, race judicata does not apply. That does not make it into a new rule, which is a term of art under all of the Teague case law. It just means that the law has has changed in a certain way. We're not arguing for an absolute rule, as I discussed in my original argument here. But the refinement of the rule means that race judicata does not apply. But either way that you look at this, under either set of circumstances, what you have is a set of witnesses who make an identification under extremely suggestive circumstances. If they were too far and too stressed to notice the very distinguishing ubiquitous Nike emblems, Oakland Raider emblems, floppy hat, Nike emblem on the hat, and huge emblem across the back of him, it seems to me that they were too far and too stressed to find the distinguishing features of Mr. Brown's face and to identify those features in a way that is credible. There is certainly doubt as to this conviction. As you can see, Mr. Brown has served his sentence and he is here and he deserves the right to reclaim his name and to lose the stigma of murderers. So we would ask that this court reverse the lower court and afford him a new trial. Thank you. Questions, Justices? No questions. No questions. I have no questions. So to both of you, thank you very much. Both Debra and David, if I were being tried for something, I think I'd want both of you representing me. The briefs were excellent. But even if I hadn't read the briefs, your arguments brought to life everything. So it was very nice and very well done. And I thank you for your time.